## J. W. CROW v. THE STATE.

### No. 3066.    Decided June 21, 1905.

**1.—Murder—Evidence—Reputation of Deceased as Dangerous Man.**

Where on a trial for murder the defendant offered testimony to show that deceased was a dangerous man while intoxicated or under the influence of whisky, and that in such condition he had shortly before the homicide made an unprovoked attack with a meat axe upon his own brother, it was error not to permit him to do so. If defendant knew as a fact, or it was brought home to his attention that deceased was a dangerous man and liable to execute threats when under the influence of intoxicants, it was the subject of legitimate proof before the jury; and where the violent or dangerous reputation of deceased is an issue, it is proper to prove the acts of the deceased showing the dangerous character, if knowledge of this characteristic is brought home to the accused; and it is immaterial whether the information was from general reputation or from knowledge of the facts themselves.

**2.—Same—Self-Defense—Provoking Difficulty—Charge of Court.**

Where on trial for murder the evidence showed that there were two difficulties between defendant and deceased, some fifteen or thirty minutes apart, and that in each the deceased was the aggressor, it was error to burden the charge of self-defense with one on provoking the difficulty.

**3.—Same—Self-Defense When Right of Ceases—Charge of Court.**

Where on a trial for murder the evidence showed that the difficulty wherein deceased was killed covered a space of a very few seconds, and deceased was shown to have been the aggressor with a drawn knife, and was killed by defendant, the latter firing three shots at him in quick succession, the last being

fired upon deceased while in the act of getting up, it was error to instruct the jury that if they should find after defendant shot deceased, thereby rendering him incapable of inflicting any injury upon defendant's person, and they should further find that defendant knew of this disabled condition of his adversary, and that all real and apparent danger to defendant's life had passed, he then shot deceased in the head, causing death, he would be guilty of murder in the first or second degree, etc.

Appeal from the District Court of Ellis. Tried below before Hon. J. E. Dillard.

Appeal from a conviction of murder in the second degree; penalty, fifteen years imprisonment in the penitentiary.

The opinion states the case.

No brief of the appellant has reached the hands of the reporter.

*Howard Martin,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of murder in the second degree, and his punishment fixed at fifteen years confinement in the penitentiary.

While McAlister was testifying appellant proposed to prove by him that he saw deceased Sam Brown, not a great while before the homicide, in the town of Red Oak, drunk or under the influence of whisky; and while in this condition undertook to kill his brother Gus Brown, with a meat ax; and further that witness and others had to hold deceased, in order to prevent him from killing his brother with the meat ax; and further that said passion or anger on the part of deceased was not caused by the act or conduct on the part of Gus Brown. The court sustained the State's objection, because he did not believe the particular character of testimony was admissible to show the reputation of the deceased. The trial court may have been correct in holding that the particular act would not prove general reputation. We understand this testimony was not offered for the purpose of proving reputation of deceased, but for the purpose of showing that he was a dangerous man while intoxicated or under the influence of whisky. It was abundantly shown by witnesses for the defense that deceased was a dangerous and violent man when intoxicated or under the influence of intoxicants. However, this was contradicted by evidence for the State. If appellant knew as a fact, or it was brought home to his attention that deceased was a dangerous man and liable to execute threats when under the influence of intoxicants, it was the subject of legitimate inquiry or proof before the jury. This, we understand has been the rule in Texas since Childress' case. Reputation of a certain character is admissible under the idea that this reputation being general everybody would be cognizant of that fact. Its office is simply to bring notice to the party who seeks to take advantage of that reputation, and from which the presumption arises that he was cognizant of such reputation. A party can as well take advantage of the knowledge of this characteristic of the deceased, where it is brought

to his actual attention or knowledge, as if he knew it from general reputation. If appellant knew of the particular instance sought to be proved by the witness he was entitled to show it. Whatever enters into the defendant's mind and prompts his action is the subject of legitimate inquiry. Where the violent or dangerous reputation of deceased is at issue, it is proper to prove the acts of the deceased showing the dangerous character, if knowledge of this characteristic is brought home to the accused. The effect upon the mind would be practically the same, whether the information was from general reputation or from knowledge of the facts themselves.

The law of self-defense is burdened with a charge on provoking the difficulty. The evidence does not suggest the issue of provoking the difficulty. Somewhere from fifteen to thirty minutes before the tragedy there had been trouble between appellant and deceased; they had been to the little village of Red Oak; deceased was drinking to a considerable extent, if not drunk. Returning from Red Oak they stopped at the residence of Mrs. Cavitt, where appellant obtained his clothing that had been washed, and placed it in the wagon. Deceased took the clothes, tore open the bundle and scattered them about on the muddy ground. Appellant expostulated with him. This brought on a fight between them, deceased being the aggressor, in which he used a knife. They were separated by Parks. Appellant left, went to Cherry's, where he resided; was gone fifteen to twenty minutes and returned. As he came out of the field, a short distance from the wagon, deceased alighted from the wagon and went towards him, and appellant says, with his drawn knife. He urged deceased not to come upon him, and fired one shot to frighten. Deceased continued to approach, and appellant continued to warn him not to come, and finally, when he got within a few feet, fired the second shot. This rather stunned deceased, but he straightened up, and some of the witnesses say, "got hold of or clinched defendant." Appellant pushed him back and fired the third shot. The testimony at this point varies somewhat as to the immediate acts of the parties. But this is a sufficient statement to illustrate the immediate environments of the difficulty. One or two witnesses testified that while appellant was coming back from his residence he was heard to use the expression, in a loud tone of voice, "God dog my rowdy soul I am coming." At this time, he was some distance away from the scene of the tragedy. Those who were nearest did not hear appellant use any expression, but heard the noise, or loud talking down at the wagon where deceased was, or in that direction. As we understand this record, the only evidence indicating any act or word on the part of appellant tending to bring on a difficulty was the expression above used. This was not heard by deceased or those parties working in the cotton field who were much nearer appellant than deceased. We do not believe this evidence suggested the theory of provoking the difficulty. If appellant, after the first difficulty with deceased, went off, got his pistol and returned for the purpose of re-

newing the difficulty or killing deceased, on account of the previous trouble, and said nothing and did nothing to deceased when he reached him to provoke a difficulty, that issue would not be in the case. The testimony shows that after he reached the scene of the difficulty, he asked deceased and urged him not to come upon him with the knife; that he did not want to kill or hurt him, and wanted no trouble with him. We think there was error on the part of the court in charging this theory of the law.

The court further charged the jury curtailing the right of self-defense to the effect that when the right of self-defense ceases then the right of appellant to shoot also ceases. This is a correct proposition of law, if the charge had stopped at this point. But it went farther, and instructed the jury that, if they should find after defendant shot deceased, thereby rendering him incapable of inflicting any injury upon his person, and they should further find that defendant knew of this disabled condition of his adversary, and that all real and apparent danger to his life had passed, he then shot deceased in the head causing death, he would be guilty of murder in the first or second degree or manslaughter as the facts might show the grade of offense to be, the penalty therefore to be determined by the jury under the evidence before them under the principal charge of the court in relation to murder in the first degree, murder in the second degree and manslaughter. This charge with reference to the grades of homicide, and the application of this principle, seems to be very much confused. Exception was reserved to this charge, and as the charge is given, we believe the exceptions are well taken. It is a correct proposition to assert under the law of self-defense, where danger to life or serious intent to injure has passed, the right of self-defense ceases. But if the right of self-defense is once operative, it continues until all danger to life or the infliction of serious bodily injury has passed. In a difficulty where one of the parties is killed, covering a space of a very few seconds, it is a very difficult proposition for the court to charge curtailing the right of self-defense. Under the strongest evidence for the State, and as strongly stated as the prosecution could demand, the whole difficulty occurred covering a space of a very few feet and in a short time. The events crowded themselves together suddenly and very hurriedly. Under the State's theory, appellant fired three shots: the first evidently missed; the second struck the body of deceased and he fell, and in the act of getting up the third shot was fired into the head of deceased. We do not understand how, if the right of self-defense existed by reason of the fact that deceased was approaching appellant with a drawn knife, and was shot down, and in getting up was fired upon by appellant and killed, the facts could have raised murder in the first or second degree. It would be a rapid transition of the mind to so place it in a cool reflective condition as to bring it within murder in the first degree under such circumstances, or even to suggest murder upon implied malice. Under no possible condition of facts or state of

mind, does it occur to us that a man's mind could be sufficiently cool and calm under that condition of facts to pass it suddenly to such a condition as to show express or implied malice. We are only discussing now the theory given in this charge; that is, passing from a case of self-defense to murder in the first or second degree. Under the condition of things existing at the time, this charge should not have been given.

For the errors indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*